MISSOURI, KANSAS & TEXAS RAILWAY COMPANY vs WEBB.

Opinion delivered November 24, 1906.

(97 S. W. Rep. 1010).

1. *Trial—Instructions.*

Instructions stating an abstract proposition of law, however correct in themselves, are necessarily misleading and mischievous, as they tend to draw the minds of the jurors away from the real facts in the case to something which they assume to exist and which cannot be found in the record.

2. *Railroads—Injury to Animals.*

Where plaintiff sued a railroad company for negligently killing a horse and fails to prove negligence; *Held,* It was error for the court to refuse the motion to direct a verdict.

3. *Evidence—Negligence—Failure of Proof.*

Before plaintiff can recover for the killing of a horse by the defendant company he must not only prove the killing of the stock; but that the killing was the result of lack of ordinary care on the part of the servants of the railroad company.

Appeal from the United States Court for the Central District of the Indian Territory; before Justice Thos. C. Humphry May 17, 1905.

Action by Doc Webb against the Missouri, Kansas & Texas Railway Company. From a judgment for plaintiff, defendant appeals. Reversed and remanded.

On November 24, 1903, this cause was instituted in the mayor's court of the city of Durant, I. T. On December

17, 1903, plaintiff filed an amended complaint, and alleged that on or about the 17th day of August, 1903, about 4 o'clock p. m., the south-bound passenger train of defendant, in the town of Sterrett, I. T., negligently and carelessly ran over and killed one horse, the property of the plaintiff: that said horse was killed by the negligence of defendant, and was of the value of $100, by reason of which plaintiff has been damaged $100, and asks judgment. On same day defendant files answer, and denies each and every allegation of plaintiff's complaint; and, "further answering, defendant states that even if the said horse was killed in the manner and at the time and place alleged in said amended complaint, but all of which is denied by this defendant, that such injury was not caused by any negligence or carelessness on the part of this defendant, or any of its agents, servants, or employes, but was due solely to negligence on the part of the plaintiff," and asks to be dismissed with its costs. The case was tried before the mayor and a jury, who returned verdict for plaintiff for $100, and defendant appealed to the United States Court at Durant, I. T. On June 22, 1904, on motion, change of venue was ordered to Atoka. On May 17, 1905, the cause was tried before a jury, who returned the following verdict: "We, the jury, duly empaneled and sworn, find the issue in favor of the plaintiff in the sum of $100.00. A. S. Attaway, Foreman." On May 20, 1905, defendant files its motion for new trial, which, on May 25, 1905, was overruled, to which defendant excepted, and by writ of error brought the case to this court.

*Clifford L. Jackson, Williams & Ulterback,* and *Joseph G. Ralls,* for appellant.

*Hatchett & Hatchett,* for appellee.

TOWNSEND, J. (after stating the facts). We have the evidence contained in this record carefully. The deposition of James Dishman was introduced by the plaintiff (appellee): "At the time the horse was killed I was walking north on the new railroad track, about two-thirds of the distance from the depot to the dirt-road crossing north of the depot. When the horse was killed he was at the dirt-road crossing (i. e., where the dirt road crosses the railroad). He was attempting to cross the track, but on seeing the train coming turned south, either on or immediately alongside of the track, and was struck by the engine about 30 or 40 feet south of the crossing. This was north of the depot, and also north of Main street in Sterrett (i. e., Main street is the street running east and west by the depot). * * * When I first saw the horse he was coming out of the inclosure gate west of the dirt and railroad ·crossing north of the depot, and he was going east. He was on the west side of the track. * * * I remember hearing the train whistle one time after it came in sight, and only once, but cannot say where it was with reference to the horse or the whistling post. * * * Yes, there is a side track parallel with the main track. I suppose it is 8 or 10 feet from the main track. It is on the west side of the main track. Yes, there were about six or seven box cars on the side track. * * * The engine killed the horse by running against him. The horse was running at the time he was struck. The engine neither stopped nor whistled, and, so far as I could judge, did not slow up when it struck the horse." The plaintiff testified that he did not see the horse killed.

The deposition of R. M. Doak, for the defendant (appellant), was introduced, and he testified that he was engineer of the train that killed the horse, and further: "The accident occurred about 5 o'clock p. m. on the 17th day of August,

1903.    *    *    *    When I first saw the horse it stepped from behind some cars directly in front of my engine.    *    * The horse was about 15 feet from the engine when I first saw it.    *    *    *    My engine was pulling a passenger train; it was No. 5, and is called the 'Katy Flyer.' There were seven cars in the train. The said cars were all loaded. The train was going south.    *    *    *    Said train was equipped with brakes.    *    *    *    Approaching the point of accident we were running on about level ground. *    *    *    The track was straight at the point of accident. *    *    *    The track at the point of accident was through clear land.    *    * .    *    No, there were no buildings in the vicinity of the accident, but there were several boarding cars at the place of the accident.    *    * .    *    The said cars were on the west side of the track coming south. The said boarding cars were about five or six feet from the track.    *    *    *    The reason I did not see the horse until the engine was upon it was because the horse was behind the boarding cars just to the west of the track.    *    *    * The train was running about 45 miles per hour when I first saw the horse upon the track.    *    *    *    Yes, there were signals given. The whistle was blown for the crossing, and the bell was ringing.    *    *    *    There were no efforts made to stop the train.    *    *    *    No efforts were made to stop the train, because when I saw the horse the engine was within 15 feet of it, and before I could raise my hand we hit it.    *    *    *    The signals were given about a quarter of a mile from the place of accident, and the same were continued until we had passed the place of accident. *    *    *    The accident occurred within the station limits of Sterrett.    *    *    *    The bell was kept ringing through the passage of the limits of said town.    *    *    * Mr. Sullivan, the fireman, was the only person that saw the accident.    *    *    *    The accident could not have

been avoided with safety to the train.    *    *    *    I could not have safely stopped this train and avoided the accident.    *    *    *    I was keeping a lookout for objects upon the track, and discovered this horse as soon as a diligent person could have discovered it under the circumstances." Upon cross-examination witness testified: "I have been a locomotive engineer since 1892. I have followed the said occupation continuously since that time.    *    *    *    The said horse was on the track when I first saw him. I could not see the horse until it stepped upon the track, for it was concealed behind some boarding cars just to the west of the main line.    *    *    *    There is a track, parallel to the main track and about five feet therefrom on the west side of the main track, along where the said horse was killed. There were no box cars on said track; there were some boarding cars; there were three or four of the said boarding cars.    *    *    * The whistling post north of the place of accident is about one-fourth mile from said place. I did cause the whistle of the said engine to blow at that point.    *    *    *    If I was to see a horse going east along a well-traveled road which crosses the railway track over which my train had to pass, going in either a walk or trot, in the direction of where the road crossed the railroad, and the said horse when I first saw it was 40 rods or thereabouts from the said railroad track, in the experience I have had as engineer I do not know what I would think the horse was going to do. My experience as an engineer has not taught me to read a horse's mind.    *    *    *    I have testified that the horse was killed on a straight track. *    *    *    I have testified that the track was nearly level at the place where the accident occurred.    *    *    * There were three or four boarding cars about five or six feet west of the main line where the accident occurred and where the horse came from onto the main line.    *    *    *    The train was running 45 miles per hour at the time of the accident.

From the point of the accident to the depot is about 50 car lengths.    *    *    *    My train was equipped with the most · improved brakes and apparatus for stopping trains. *    .*    *    With the brakes with which my train was run, and under the same conditions, a train could be stopped in about 700 feet. I cannot say how much time would be consumed.    *    *    *    I did blow the whistle immediately before I got to the crossing where the accident occurred, and the bell was ringing continuously for about one-fourth mile before the animal was struck. I gave signals for one-fourth of a mile before we reached the crossing where the animal was struck.    *    *    *    It is the rule and custom to have the whistle blown and the bell rung before crossing a public crossing on the Missouri, Kansas & Texas Railway. The bell was rung for one-fourth mile before we crossed the crossing where the horse was struck, and the whistle was blown at the whistling post. The custom was not disobeyed in this instance. *    *    *    There has been no data, information, or letters furnished me in making my answers.    *    *    *    There is and has been no one present during the time my deposition has been taken except Mr. Haven, the officer taking the deposition, and myself.    *    *    *    If I had seen the horse three or four hundred yards from the place where he was struck, I could have stopped the train and not struck it."

The defendant (appellant) introduced the deposition of C. Sullivan, who testified that he was the fireman on the train that killed the horse. "The horse was on the track in front of the engine when I first discovered it.    *    *    *    When I first saw the horse, the engine was right on it.    *    *    There were no buildings near the place of accident; there were three or four boarding cars on the track just west of the track our train was on, about six feet from said track.    *    *    *    I did not see the horse sooner because the horse was behind

the boarding cars on the right side of the track and I was on the left side of the engine. I did not see the horse until the engine was right on it; in other words, when I saw the horse the engine struck it.    *    *    *    The train was going about 45 miles per hour when I first saw the horse upon the track, or, rather, when I first saw the horse, for I did not see it until it was on the track.    *    *    *    There were signals given. The whistle was blown for the crossing and for the town or station, and the bell was started ringing about a quarter of a mile before we reached the crossing where the accident occurred, and continued to ring until we had crossed the same.    *    *    *    There were no efforts made to stop the train because the horse jumped from behind the boarding cars on the track just in front of the engine while the train was running about 45 miles per hour, and before any effort could be made to stop the train the engine struck the animal. *    *    *    The engineer on the engine was the only person that witnessed the accident, so far as I know. I saw no one else at the time.    *    *    *    The train could not have been safely stopped and the accident avoided; it was impossible to stop the train before the animal was struck. *    *    *    I was keeping a lookout for objects upon the track, and I discovered this horse as soon as a diligent person could have discovered it under the circumstances." Upon cross-examination the witness testified: "I have been a loco-motive fireman for about four years. I have followed the same occupation continuously.    *    *    *    I did not see the horse until he was on the track immediately in front of the train.    *    *    *    There is a side track, parallel to the main track, along where the said horse was killed, and there were no box cars on the said track. There were three or four boarding cars on said track at the time the horse was killed.    *    *    *    The whistle was blown at the post one-quarter of a mile from the crossing where the horse was

killed, and the bell was started to ringing at the said post, and continued to so ring until after the train had passed the crossing where the accident occurred. The train passed the crossing at about 45 miles per hour. All signals were given to notify stock or persons that should attempt to cross the thoroughfare. The said signals were given for a quarter of a mile before we reached the said crossing, and were continued to be given until we had passed the said crossing.    *    *    * It is the universal custom and rule of the Missouri, Kansas & Texas Railway Company to have its engineers and firemen to ring the bells of the engine and blow the whistles of the engines they have in charge when passing over a public crossing in an incorporated town. These rules and customs were not disobeyed on this occasion, but were carried out in every respect.    *    *    *    I am answering these interrogatories from my memory, and I have not consulted any data or memorandum.    *    *    *    No one has been present during the time my deposition has been taken except the officer taking the same, and myself.    *    *    *    We could not avoid an accident when the engine struck the horse just as we saw it, and the horse did not appear from behind the boarding cars until the engine was right on it. It was impossible to stop the train in time to avoid the accident. The accident could have been avoided if the horse had been in sight three or four hundred yards before the engine struck it. This train could have been stopped in about 700 feet."

This was all the evidence by appellant and appellee of witnesses who saw the accident. The court, among other instructions, gave to the jury the following: "The negligence for which it would be liable is the failure of its engineers or employes operating its engines and trains to exercise reasonable care to discover animals upon the track, and to avoid striking them after they have discovered them. Reasonable care is

the care which a prudent person would use in like agencies and under like circumstances. If you believe from the evidence that the defendant's employes operating its engines were guilty of lack of reasonable care in endeavoring to discover animals upon its track and to avoid striking them, and by reason of said lack of care injury was inflicted upon the animal (in this case a horse), and that such injury would not have occurred but for the failure on the part of the defendant's engineer or employes operating its engines to exercise reasonable care to discover the horse upon the track and to avoid striking him, then you should find for the plaintiff. If you find that defendant's engine and train did actually kill the stock, but that there was not a failure upon the part of its employes operating its engines to exercise reasonable care—that is, the care which a reasonable, prudent man with like agencies and under like circumstances would exercise to discover animals upon the track and avoid striking them or inflicting injuries upon them—the defendant would not be liable, and as to such horse, where you find there was not a failure to exercise such care, your verdict should be for the defendant. The court instructs you that it does not necessarily follow that when an engineer discovers an animal upon the track that he is negligent if he does not stop his train. Regard must be had for his own safety and for the safety of his fellow employes and passengers, and if a reasonable, prudent man, under circumstances in which an engineer may be shown to have been by the evidence when the animal was discovered, would not have checked the train in the exercise of reasonable prudence and caution, then he would not be guilty of negligence, and the company would not be liable in that case. If, however, in the exercise of such care after discovery of the animal, having due regard to his own safety and the safety of his fellow employes and passengers, he could have stopped the train or slackened its speed or avoided striking the animal, and the evidence

showed that he failed to exercise reasonable care in that particular, then the defendant would be liable for such injury. The degree of care to be exercised is to be determined by the exigencies of the situation, having regard not only to the killing or avoiding injury to the animal, but also the safety of the engineer and his fellow employes.    If in the exercise of ordinary care he could have stopped or slackened his speed or avoided the injury as I have told you, and he failed to do so, it would be negligence for which the company would be liable.    If he could not do these things, having regard to the safety of himself and his fellow employes and passengers, he would not be negligent.    Of this matter you are the judges under the evidence, The burden is upon the plaintiff to show negligence on the part of the company's employes operating its engines, and, if he has failed to show a failure upon the part of the company's employes to exercise ordinary care as thus defined to you, then your verdict will be for the defendant.    If it is shown that such failure to exercise that degree of care resulted in the injury to the stock in question, then your verdict will be for the plaintiff.    If you find for the plaintiff, you must find a reasonable market value for the animal so killed because of the negligence of its employes under the instructions that I have given you.    Gentlemen, you are the sole judges of the credibility of the witnesses, and weight to be given to their testimony.    You will take into consideration all the testimony in the case, and if you find by a preponderance of the evidence that the plaintiff has made out his case according to the instructions I have read you, then your verdict should be for the plaintiff in such sum as the evidence shows the horse was worth; and if you fail to so find by a preponderance of the testimony, then your verdict should be for the defendant."    The court then further instructed the jury as follows: "If, however, in the exercise of such care after the discovery of the animal,

20

having due regard to his own safety, that of his fellow employes, and, in this case I would say, to the passengers on the train, he could have stopped the train or slackened its speed or avoided striking the animal, and the evidence showed that he failed to exercise reasonable care in that particular, resulting in the injury to the animal, then the defendant would be liable for such injury." The court then further instructed the jury as follows: "Of course, gentlemen of the jury, the servants of the train, in charge of the train, the highest duty of the servants and engineers, would be to the passengers upon the train, if the proof shows that it was a passenger train, and the engineer and servants of the defendant would not be required—it would not be their duty—to injure their passengers in an attempt to save a horse."

The foregoing instructions would be very proper in a case where they were applicable to the facts, but as to the case on trial they were abstract propositions of law. In Bowen vs Clarke (Or.) 30 Pac. 431, 29 Am. St. Rep. 626, the court say: "We have several times held that abstract propositions of law, however correct in themselves, are necessarily misleading and mischievous. They tend to draw the minds of the jurors away from the real facts in the case to something which they assume to exist, but which cannot be found in the record."

The appellant has filed ten specifications of error, but in our opinion the evidence in this case establishes beyond question that there was no negligence by the defendant, and that the first specification of error should be sustained. In St. Louis & San Francisco Ry. Co. vs Zackary (Ind. Ter.) 53 S. W. 327, the court says: "There is nothing in the evidence in this case which establishes negligence on the part of the railroad company. It was error to refuse the motion to direct a verdict."

In C., R. I. & P. Ry. Co. vs Huggins (I. T.) 69 S. W. 845, the court say: "In order that the plaintiff may recover in this kind of an action, there must not only be proof of the killing of the stock, but that the killing resulted from the lack of ordinary care on the part of the servants of the railway company. If there is no negligence there is no liability. Proof of the killing of the stock is not sufficient. The plaintiff must go further. He must aver and prove negligence on the part of the railroad company. * * * If there is no proof of negligence, the court should instruct the jury to find for the defendant. We are of opinion that there is no proof of negligence upon the part of the railroad company. In fact, the testimony of the engineer in charge of the train negatives the charge of negligence, and the plaintiff offers no evidence to support his contention that the stock was killed through the negligence of the defendant company. The court is of the opinion that the peremptory instruction asked for by the defendant in the court below should have been given."

In our judgment, the case should be reversed and remanded.

GILL, C. J., and LAWRENCE and CLAYTON, JJ., concur.